1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11  PUBLIC SERVICE MUTUAL                 No.  2:14-cv-00226-MCE-KJN
    INSURANCE CO.,
12
                  Plaintiff,
13                                         **MEMORANDUM AND ORDER**

14        v.

15  LIBERTY SURPLUS INSURANCE
    CORPORATION and DOES 1 through
16  10, inclusive,

                  Defendants.
17

18

19        Through the present action, Plaintiff Public Service Mutual Insurance Company

20  ("PSMIC" or "Plaintiff") seeks equitable indemnification from another insurance carrier,

21  Liberty Surplus Insurance Corporation ("LSIC" of Defendant") for amounts paid by

22  PSMIC for the defense and indemnification of its insureds, Fair Oaks Fountains, LLC

23  ("FOF") and FPI Management Company ("FPI").  According to PSMIC's Complaint, LSIC

24  was obligated to pay those amounts under its own policy, issued to Gala Construction,

25  on grounds that both FOF and FPI were specifically designated as additional insureds

26  under the LSIC policy, and because, according to PSMIC's Complaint, the LSIC policy

27  was primary as to the underlying loss.  That loss occurred when an injury occurred,

28  allegedly as a result of Gala's negligence, while Gala effectuated repairs on an

                                          1

apartment complex owned by FOF and managed by FPI.  Presently before the Court is Defendant LSIC's Motion for Summary Judgment, which alternatively requests partial summary judgment as to certain issues.  As set forth below, Defendant's Motion is DENIED.[1]

**BACKGROUND**

On August 19, 2008, Diana Balfour, a tenant at the Fountains of Fair Oaks, an apartment complex located in Fair Oaks, California, slipped on a puddle of standing water in her apartment. Def.'s Statement of Undisputed Facts ("DUF") No 4.  On July 14, 2010, Balfour filed suit against both FOF, the apartment owner, and FPI, the company that managed the complex, for the injuries she claimed resulted from that fall.  Id. at 1-4. Balfour initially included only FOF and FPI as defendants, alleging that they "were responsible for the design, construction, maintenance, control and/or supervision" of the apartments, and accordingly bore liability for her injuries  Id. at 7.  She also contended, however, that unidentified Doe defendants were also responsible for the standing water due, inter alia, to construction activities on the apartments.  Pl.'s Compl., Ex. 3, ¶ 7.  By her First Amendment to the Complaint, filed September 30, 2010, Balfour substituted Gala Construction Inc. ("Gala") in place of Doe I and therefore asserted those claims against Gala.[2]  FOF had contracted with Gala to perform construction work on the apartment complex.  PUF at ¶¶ 16-17.

The construction contract between Gala and FOF required Gala to indemnify FOF and its agents for liability arising out of Gala's work, providing in pertinent part as follows: ///

[1] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the papers. E.D. Cal. Local R. 230(g).

[2] Defendant requests that the Court judicially notice, pursuant to Federal Rule of Evidence 201(b), Balfour's First Amendment to the Complaint in the underlying action.  That request is unopposed and is accordingly GRANTED.  The Court further notes that Plaintiff has also requested that the Court judicially notice documents in Ms. Balfour's underlying action.  That request is also GRANTED as unopposed.

2

> Contractor [Gala] shall indemnify and hold harmless the Owner [FOF and its agents or employees] from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work…. but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them to anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

Pl.'s Separate Statement of Undisputed Facts in Opp'n to Def.'s Mot. ("PUF"), ¶ 3.[3]

Additionally, the construction agreement required Gala to maintain general liability insurance coverage in specific amounts, and mandated that FOF be named as an additional insured on that policy by formal endorsement.  PUF at ¶ 4.  Plaintiff alleges that consistent with that directive, the liability policy issued to Gala by LSIC contained a separate endorsement specifically adding FOF by name as an insured.  DUF at ¶ 45.[4]

Plaintiff contends that FOF also qualified as an additional insured under two separate endorsements given the fact that the Gala construction agreement with FOF contractually required coverage, and the LSIC policy in fact provided coverage to a party "as required by written contract."  See DUF at ¶¶ 53, 56.  The LSIC policy endorsements, however, specified that the coverage provided to FOF as an additional insured was only with respect to FOF's liability arising from Gala's work on FOF's behalf.  Id.  Because FPI was FOF's real estate manager at the time of the subject loss, Plaintiff nonetheless claims that FPI also became an additional insured under the LSCI policy by virtue of language extending coverage to any organization acting as a real estate manager for an insured.  DUF at ¶¶ 46, 50.

///

---

[3] Defendant interposes various objections to Plaintiff's Separate Statement of Undisputed Facts.  To the extent this Memorandum and Order relies on assertions made in the Statement to which objections have been made, those objections are overruled.

[4] While LSIC argues that this particular endorsement was not included in the list of forms and endorsements comprising the LSIC policy, PSMIC contends that Gala provided FOF with the endorsement and represented that it was provided by LSIC.  At best, this constitutes a disputed issue of fact precluding any grant of summary judgment premised on the lack of that particular endorsement.

1    Finally, and perhaps most significantly, the LSIC policy specified that the

2    coverage it provided would be primary with respect to any other insurance carried by

3    additional insureds like FOF and FPI:

> To the extent that this coverage is afforded to any additional insured under the policy, **such insurance shall apply as primary and not contributing with any Insurance carried by such additional insured**, as required by written contract.

7    PUF at ¶ 7 (emphasis added).

8    As the general liability carrier for FOF and FPI, Plaintiff accepted their defense in

9    the underlying lawsuit but nonetheless also tendered that defense to LSIC on numerous

10   occasions in 2008 and 2009.  DUF at ¶¶ 18, 73.  PSMIC also unsuccessfully tendered

11   the defense of FOF and FPI to LSIC after Gala was added as a defendant to the

12   underlying Balfour lawsuit on April 8, 2011.  Plaintiff contends that LSIC has consistently

13   refused to accept those tenders, despite that fact that, according to Plaintiff, "the injuries

14   and damages prayed for by Ms. Balfour in the Underlying Action arise out of, or are

15   directly and/or indirectly connected with the work performed, materials furnished by,

16   and/or services provided by GALA, its employees, subcontractors or agents to and/or on

17   behalf of FOF and FPI" under the construction contract (Compl., 6:28-7:3) and despite

18   the language of LSIC's own policy which described its coverage as primary.  Given

19   LSIC's refusal to defend and indemnify, PSMIC claims it was forced to provide a

20   unilateral defense to FOF and FPI and to fund a settlement with Ms. Balfour reached in

21   April of 2013, which included the sum of $50,000.00 paid by PSMIC on behalf of FOF

22   and FPI.

23   Plaintiff initially filed a suit against LSIC in the name of FOF and FPI.  That lawsuit

24   was voluntarily dismissed after PSMIC confirmed in discovery that it had funded the

25   defense and indemnification of FPF and FPI in the Balfour action such that FOF and FPI

26   themselves sustained no damage.  PSMIC then filed the present action on its own behalf

27   to recover the expenses it had incurred by way of equitable subrogation.  Plaintiff's

28   complaint contained causes of action for breach of contract, breach of the implied

1   covenant of good faith and fair dealing and declaratory relief.  By Memorandum and

2   Order filed September 30, 2014, this Court denied Defendant's Motion to Dismiss with

3   the exception of the declaratory relief cause of action, which it dismissed as redundant.

4   Defendant now moves for summary judgment, or alternatively for summary adjudication,

5   as to Plaintiff's remaining claims.

6

7                                        **STANDARD**

8

9        The Federal Rules of Civil Procedure provide for summary judgment when "the

10  movant shows that there is no genuine dispute as to any material fact and the movant is

11  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

12  Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

13  dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

14        Rule 56 also allows a court to grant summary judgment on part of a claim

15  or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party

16  may move for summary judgment, identifying each claim or defense—or the part of each

17  claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

18  Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

19  motion for partial summary judgment is the same as that which applies to a motion for

20  summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

21  Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

22  judgment standard to motion for summary adjudication).

23        In a summary judgment motion, the moving party always bears the initial

24  responsibility of informing the court of the basis for the motion and identifying the

25  portions in the record "which it believes demonstrate the absence of a genuine issue of

26  material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

27  responsibility, the burden then shifts to the opposing party to establish that a genuine

28  issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith

                                            5

1    Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

2    253, 288-89 (1968).

3         In attempting to establish the existence or non-existence of a genuine factual

4    dispute, the party must support its assertion by "citing to particular parts of materials in

5    the record, including depositions, documents, electronically stored information,

6    affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

7    not establish the absence or presence of a genuine dispute, or that an adverse party

8    cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

9    opposing party must demonstrate that the fact in contention is material, i.e., a fact that

10   might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

11   Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

12   Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also

13   demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

14   such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

15   477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

16   before the evidence is left to the jury of "not whether there is literally no evidence, but

17   whether there is any upon which a jury could properly proceed to find a verdict for the

18   party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

19   (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

20   As the Supreme Court explained, "[w]hen the moving party has carried its burden under

21   Rule [56(a)], its opponent must do more than simply show that there is some

22   metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore,

23   "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

24   nonmoving party, there is no 'genuine issue for trial.'"  Id. 87.

25         In resolving a summary judgment motion, the evidence of the opposing

26   party is to be believed, and all reasonable inferences that may be drawn from the facts

27   placed before the court must be drawn in favor of the opposing party.  Anderson,

28   477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the

6

opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A.  Duty to Defend or Indemnify**

LSIC initially argues for summary judgment in its entirety on grounds that it owes no obligation whatsoever under its policy.  According to LSIC, neither FOF nor FPI can qualify as insureds because any liability on their part cannot have risen from the "work," of Gala so as to trigger coverage under LSIC's policy.  In the absence of any such qualifying activity, LSIC maintains it had no duty to defend or indemnify either entity. Given the many triable issues of fact as to just what occurred and what role Gala played, however, no such determination can be made as a matter of law on summary judgment.

The LSIC Policy's coverage must first be delineated.  Endorsement No. 4 of the Policy provides coverage for "completed operations" to the extent liability arises out of "your work."  DUF at ¶ 53.  "Your work," in turn, is defined as "work or operations performed by you or on your behalf."  Id. at ¶ 54.  "You" and "your" refer not only to Gala as the named insured, but also "any other person or organization qualifying as a named insured under the policy."  Id. at ¶ 49.  Endorsement 4 also extends such coverage to any "person or organization" as required by written contract."  Id. at ¶ 53.  As indicated above, the construction contract between LSIC's named insured, Gala, and FOF not only requires liability coverage but mandates that FOF be named as an additional insured on the policy by formal endorsement.  FOF therefore appears to qualify for coverage under the LSIC policy not only because such coverage was required by the construction contract, but also because Endorsement Form CGL1037 specifically names FOF as an additional insured.[5]

_____
[5] While LSIC argues that this endorsement was not specifically included in the list of forms and

7

1    In addition to the "completed operations" coverage provided by Endorsement

2  No. 4, Endorsement No. 5 of the LSIC policy provides coverage for liability arising out of

3  "your ongoing operations" performed for a person or organization as required by written

4  contract.  Id. at ¶ 56.  Consequently, between the two endorsements, both ongoing and

5  completed operations are covered both for the named insured (here Gala) and any

6  additional insured required to be covered through written contract or by way of

7  endorsement (here FOF).  The only requirement is that liability must arise from Gala's

8  operations, whether ongoing or completed.[6]

9    LSIC's contention that there is no evidence that the underlying injury occurred

10  because of its operations is without merit.  After learning that Ms. Balfour had slipped in

11  water in her apartment, FOF's maintenance manager Raymond Jordan discovered that

12  the ceiling of the apartment above Ms. Balfour's had collapsed, and that the water had

13  flowed down the walls and into the space between the apartments, which resulted in

14  water accessing Ms. Balfour's space.  PUF at ¶ 11.  Mr. Jordan also states he observed

15  a 2-inch plastic pipe open from the roof to the upstairs apartment, and when he climbed

16  up on the roof he states he saw a puddle of water about 4 feet in diameter that extended

17  to the edge and same level of the top of the pipe.  Id. at ¶ 12.

18    After discovering how water had apparently gotten into the apartment, Mr. Jordan

19  next investigated the source of the water and found a stepping stone propped on top of a

20  sprinkler close to Balfour's building.  Balfour and the plumber who was assisting him

21  moved the stone and discovered that the sprinkler head beneath had broken off.  Id. at

22  13.  Then, when Mr. Jordan turned on the sprinklers, he observed that water from the

23  broken irrigation pipe shot straight to the roof of the building and splashed onto the roof

24  itself.  Because the sprinkler timers were set to come on at night, sometime after

25  _____

26  endorsements comprising the LSIC policy, it appears undisputed that GALA provided FOF with the
endorsement and said it obtained the endorsement from LSIC.

27    [6] California courts have consistently given a broad interpretation to the "arising from" requirement
in the sense that it does not require a specific standard of causation or theory of liability.  Consequently,
coverage does not depend on whether an additional insured's potential liability is vicarious or direct.

28  Acceptance Ins. Co. v. Syufy Enterprises, 69 Cal. App. 4th 321, 328, 331 (1999).

1   8:00 p.m., ( id. at ¶ 14), Jordan concluded that the broken sprinkler was the source of

2   the pooled water in Ms. Balfour's apartment the evening she was injured.

3       In addition to the aforementioned investigation into the source of the water,

4   Mr. Jordan also testified that the day before the incident, when he was a couple of

5   buildings away from  Ms. Balfour's apartment, he heard a loud booming sound

6   emanating from the direction of the her building.  When he ran toward the noise, Jordan

7   stated he saw an air conditioning condensing unit on the ground where he later

8   discovered the broken sprinkler ahead.  Jordan testified he also saw two construction

9   workers on the roof and deduced that they had thrown the unit off the roof to the ground

10   below.  Based on his investigation, Jordan also reasoned that the condensing unit broke

11   the sprinkler head when it hit the ground.  Id. at ¶ 15.

12       Significantly, Ms. Balfour herself appears to corroborate what Mr. Jordan saw.

13   During the day prior to the evening when she slipped on the puddle of water, Ms. Balfour

14   states she witnessed, while out on her patio, an air conditioning unit falling from the roof

15   some eight to ten feet away.  SUF at ¶ 16.  She further claims she saw a man on the

16   roof before going back insider her apartment, and later saw two men carrying the pieces

17   of the unit to the garbage.  Id.

18       Drawing all inferences from this evidence in favor of Plaintiff as the party opposing

19   LSIC's motion for summary judgment, as the Court is required to do, we conclude that

20   there are facts suggesting that workmen on the roof may have caused sprinkler damage

21   that, in turn, caused water to pool on the roof of Ms. Balfour's building and enter her

22   apartment.  We next examine whether there is any evidence that Gala was responsible

23   for work done on the complex roof, and, in particular, whether that work involved air

24   conditioning units.

25       LSIC argues that Gala's exterior work was limited to removing and replacing

26   siding and windows in all the exterior units, installing metal flashing for weatherproofing,

27   adding exterior storage closets, repairing and replacing of the patio that attached to the

28   exterior storage, exterior painting, and adding exterior patio fences and rails.  DUF at

¶ 34.  LSIC goes on to claim that Gala's scope of work expressly did not include any

changing or replacement of heating and air conditioning units.  Id. at ¶ 36.  As Plaintiff

points out, however, the testimony of Gary Whitesides, Gala's president, indicates that

Gala's work may nonetheless have included the replacement of rooftop air conditioning

units at the complex through its subcontractor, Kosco Heating and Air.  Whitesides

further admitted that Gala charged FOF for this work and purchased replacement air

conditioning units which were used in the project.   See Whitesides Decl., Ex. O to the

Decl. of Brian J. O'Connor,  45:5-47:9, 80:18-81:4; 109:17-110:5,  Again, drawing the

inferences from this testimony in Plaintiff's favor, as it must, the Court cannot rule out

Gala's involvement in replacing the air conditioning condensing unit identified by

Mr. Jordan and Ms. Balfour.  Consequently, LSIC has not demonstrated as a matter of

law that Ms. Balfour's injuries were unrelated to its operations on the premises, and it

must in order to avoid any potential duty to defend of indemnify on that basis.  Because

LSIC's motion for summary judgment as to the case in its entirety depends on that

argument, LSIC's motion is DENIED.  We now proceed to LSIC's discrete claims for

partial summary judgment as to certain issues, which will be addressed in turn below.

### B.  Whether FPI Qualifies as an Additional Insured under the Defendant LSIC's Policy

LSIC argues that because FPI, for its part, had no contract with Gala and was

not Gala's property manager, FPI cannot be an additional insured under its policy.  LSIC

therefore contends it had no duty to either defend of indemnify FPI and is accordingly

entitled to summary adjudication.  Defendant's argument in this regard also fails.

The LSIC policy includes within the definition of an insured, "[a]ny person (other

than your employee)," or any organization while acting as **your** real estate manager."

DUF No. 50.  As indicated above, "you" and "your" refer to the named insured shown in

the LSIC policy declarations, as well as any other person or organization qualifying as a

named insured.  DUF No. 49.  LSIC contends that Gala is the only named insured, and

since FPI never acted as a real estate manager for Gala, FPI cannot qualify as an

insured.  As indicated above, however, Plaintiff has identified an additional insured endorsement that names FOF.  While LSIC appears to dispute the validity of the endorsement, FOF contends it was provided by Gala as having been issued by LSIC.  At best, this creates a triable issue of fact precluding summary judgment on this score, since if FOF is indeed an additional insured FPI as its real estate manager also becomes an insured.

### C.  Time Parameters for Duty to Defend

Defendant's  second argument in favor of summary adjudication is that even if it had a duty to defend, that duty was not triggered until April 8, 2011, when FPF and FPI first tendered their defense to LSIC after Gala was added to the underlying suit as a Doe defendant.  According to LSIC, despite the fact that Plaintiff had already tendered the defense of FOF and FPI on numerous occasions, until Gala was named as a Doe defendant in Diana Balfour's underlying lawsuit, there was no duty to defend since Balfour made no allegations beforehand concerning Gala's potential involvement in her injury.  Plaintiff on the other hand, maintains that LSIC's duty to defend was triggered once Balfour's initial suit was filed on July 14, 2010.  This is because, according to PSMIC, both Gala and LSIC had been informed of the facts giving rise to Gala's potential liability since at least May of 2009, when emails and letters informed them that Ms. Balfour's injuries arose out of construction/renovation work performed by Gala.  In particular, PSMIC advised LSIC that water from a sprinkling system damaged by air conditioning equipment shot up on the roof and got into the building through an uncapped pipe.  See Pl.'s Response to DUF ¶ 18.  Given those communications and the detail they provided, LSIC cannot credibly claim that its duty to defend did not arise until Gala was formally substituted into the suit as a fictitious defendant.  LSIC's request for summary adjudication on that issue accordingly fails.

///

///

///

### D.  Validity of Plaintiff's Equitable Subrogation Claim

LSIC also reasserts its claim that PSMIC is not entitled to equitable subrogation under the circumstances of this matter, despite the fact that the Court rejected that same argument in LSIC's previous motion to dismiss.

PSMIC's Complaint is indeed premised on principles of equitable subrogation. According to PSMIC, because it defended FOF and FPI in the underlying action, and subsequently paid to settle Ms. Balfour's personal injury claim, PSMIC "became subrogated to all the rights of FOF and FPI in the sums paid for defense and indemnity and PSMIC therefore became entitled to enforce all of the remedies available to FOF and FPI against [LSIC] with respect to those sums."  Compl., ¶ 25.  Equitable subrogation as advocated by PSMIC requires that the non-participating insurer, here, LSIC, was primarily liable for the entire loss, thereby making its equitable position superior to that of LSIC.  See Maryland Cas. Co. v. Nationwide Mut. Ins. Co., 81 Cal. App. 4th 1082, 1088 (2000).  LSIC, on the other hand, argues that because it shared the same level of liability on the same risk with PSMIC, PSMIC cannot pursue a subrogation claim for defense and indemnification costs and instead is limited to pursing an equitable contribution claim that PSMIC has not alleged.   See id. at 1089.

The Court must consequently decide whether Plaintiff's lawsuit properly sounds in subrogation or instead whether principles of contribution should apply.  Significantly, the LSIC policy itself provides that with respect to additional insureds like FOF and FPI, its coverage "shall apply as primary and not contributing with any insurance carried by such additional insured."  PUF at ¶ 7.

LSIC's own description of its policy as primary with respect to other policies maintained by FOF and FPI is entitled to deference.  Courts generally enforce the terms of insurance policies pertaining to allocation issues and the characterization of its own policy as "primary" or "excess."  Maryland Cas. Co. v. Nationwide Mutual Ins. Co., 81 Cal. App. 4th at 1090.  Here LSIC did just that.  While LSIC cites cases preventing an insurer with primary coverage from arguing it becomes excess because of an "other

1   insurance" clause to that effect, those cases hinge on the primary carrier's

2   characterization of its own coverage as excess to other policies.  See Residence Mut.

3   Ins. Co. v. Travelers Indem. Co., 26 F. Supp. 3d 965, 974 (C.D. Cal. 2014 ("the inclusion

4   of an 'other insurance' clause in an otherwise primary policy will not convert a primary

5   policy into 'true' excess coverage").  Here, on the other hand, we have LSIC's

6   recognition that any other insurance carried by an additional insured is excess over its

7   own coverage.  In other words, while a primary carrier like LSIC may not be able to make

8   its own policy excess to other policies applicable to the loss, its choice to characterize its

9   own policy as exclusively primary may become binding.

10       As several courts have noted, few legal doctrines have caused more confusion

11   and headache for both courts and litigants than have contribution and subrogation.

12   American States Ins. Co. v. Nat'l Fire Ins. Co. of Hartford, 202 Cal. App. 4th 692, 700

13   (2012), citing Firemans Fund Ins. Co. v. Maryland Cas. Ins. Co., 65 Cal. App. 4th 1279,

14   1291 (1998).  Although both concepts are equitable in nature, they are nonetheless

15   distinct.  Id.  Equitable subrogation "applies to apportion costs between insurers that

16   share the same level of liability on the same risk as to the same insured."  Maryland Cas.

17   Co. v. Nationwide Mutual Ins. Co., 81 Cal. App. 4th at 1089.  Subrogation, on the other

18   hand, is the "substitution of another person in place of the creditor or claimant to whose

19   rights he or she succeeds in relation to the debt or claim."  Fireman's Fund Ins. Co. v.

20   Maryland Cas. Co., 65 Cal. App. 4th at 1291.  In the case of insurance, subrogation

21   "allows an insurer that paid coverage or defense costs to be placed in the insurer's

22   position to pursue a full recovery from another insurer who was primarily responsible for

23   the loss.  Maryland Cas. Co. v. Nationwide Mutual Ins. Co., 81 Cal. App. 4th at 1088-89.

24   "Where different insurance carriers cover differing risks and liabilities, they may proceed

25   against each other for reimbursement by subrogation rather than by contribution."

26   Transcontinental Ins. Co. v. Ins. Co. of the State of Pa, 148 Cal. App. 4th 1296, 1304

27   (2007); citing Reliance Nat. Ind. Co. v. Gen'l Star Indem. Co., 72 Cal. App. 4th 1073,

28   1077-79 (1999).

1    Since it was LSIC that made its own policy primary and any other policy excess,

2    equitable contribution does not appear to apply because PSMIC and LSIC "did not share

3    the same level of liability and were not obligated to defend the same loss or claim."

4    Transcontinental Ins. Co. v. Ins. Co. of the State of Pa., 148 Cal. App. 4th at 1304.

5    Additionally, as the insurer seeking subrogation, PSMIC must show that

6    LSIC was "primarily liable for the loss."  Id.

7    The essential elements for a subrogation claim against an insurer include that:

8    1) the insured has suffered a loss for which the defendant insurer is liable; 2) the claimed

9    loss was one which the insurer seeking subrogation was not primarily liable; 3) the

10   insurer has compensated the insured for the loss for which the defendant insurer is

11   primarily liable; 4) the insurer has not paid the claim as a volunteer; 5) the insured has

12   an existing, assignable cause of action against the defendant insurer which the insured

13   could have asserted for his own benefit had he not been compensated for the loss by

14   the insurer; 6) the subrogating insurer has suffered damage by the defendant insurer's

15   acts or omissions; 7) justice requires on equitable grounds that the loss be entirely

16   shifted from the subrogating insurer to the defendant insurer; and 8) the subrogating

17   insurer's damages are liquidated in nature.  Fireman's Fund Ins. Co. v. Maryland Cas.

18   Co., 81 Cal. App. 4th at 1292-93.  As long as the prerequisites are met, no finding of any

19   separate duty owed to an excess carrier is present.  See Continental Cas. Co. v. Royal

20   Ins. Co. of Am., 219 Cal. App. 3d 111, 118 (1990).

21   Applying these principles to the facts of the present matter, the Court has already

22   concluded that the policy issued by Defendant is primary given the provisions of LSIC's

23   own policy.  Moreover, since Ms. Balfour alleges that her injuries were due, inter alia, to

24   Gala's negligence, it would appear equally clear at this point that the LSIC policy covers

25   FOF and FPI's potential liability for her damages.  It is further undisputed that PSMIC

26   has paid for both the defense and indemnification of its insureds in the Balfour lawsuit

27   and did not do so as a volunteer given LSIC's refusal to extend coverage.  Additionally,

28   for purposes of claiming damages by way of subrogation, the question of whether the

14

1  insured  has been damaged is measured by whether or not damage would have

2  occurred had the excess carrier, here Plaintiff, had not stepped in to cover the loss (see

3  Interstate Fire and Cas. Ins. Co. v. Cleveland, 182 Cal. App. 4th 23, 36 (2010)).  On that

4  basis, damage is present.  Further, since PSMIC's subrogated damages, in the form of

5  sum certain defense costs and a fixed sum paid, PSMIC's damages are liquidated in

6  nature.

7       The only remaining question, and probably the closest determination in assessing

8  the prerequisites for equitable subrogation here, rests with determining whether the

9  equities mandate that LSIC, as opposed to PSMIC bear the entire burden of covering

10  the defense and indemnification costs.  In making that determination, courts have looked

11  to whether the party seeking indemnification had any role in causing the accident, and

12  whether there was any contractual obligation on the part of the defendant insurer to

13  provide defense and indemnification.  See, e.g., Interstate Fire and Cas. Ins. Co. v.

14  Cleveland, 182 Cal. App. 4th at 37-39.  Here, there is no evidence that PSMIC, or its

15  insureds, FOF and FPI had anything to do with causing the underlying loss.  Further, the

16  LSIC policy expressly agreed to provide coverage to both FOF and FPI for damages

17  arising from Gala's negligence in performing work at the apartment complex where the

18  incident occurred. Consistent with that obligation, Gala itself agreed, in its construction

19  contract, to defend and indemnify FOF and FPI for any losses they incurred as a result

20  of Gala's negligence at the project site.  Pl.'s Compl, Ex. B, p. 17, § 3.18.1.  All these

21  factors point to a conclusion at this time that the equities do not support LSIC's failure to

22  step in and provide the defense and indemnification, with the entire burden of

23  shouldering those expenses properly transferred to LSIC.

24       Given the above, the Court cannot determine as a matter of law that equitable

25  subrogation cannot be pursued by LSIC in this matter, and hence LSIC's request for

26  summary adjudication as to that issue must be denied.

27  ///

28  ///

15

**E.  Breach of Contract/Implied Covenant of Good Faith and Fair Dealing**

LSIC again argues the merits of Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing on grounds largely identical to those already rejected.  LSIC's reiteration of its arguments depends on a finding that LSMIC cannot pursue its equitable subrogation claim as a matter of law, but as stated above that argument fails.

As it did previously in moving to dismiss, LSIC's challenge to LSMIC's breach of contract claim is two-pronged.  First, LSIC argues that because PSMIC lacks any privity of contract with LSIC, it cannot state a claim for contractual breach.  Secondly, LSIC asserts that because FPI and FOF suffered no damages (since their defense and indemnification costs were covered by PSMIC), there are no damages to PSMIC's insureds to which PSMIC can claim subrogation.  Neither argument is persuasive.

For purposes of subrogation, privity of contract between insurers is not required. That is because of the nature of subrogation, which looks to the nature of insurance as a contract of indemnity as opposed to any relation of contract or privity between insurers. Northwestern Mutual Ins. Co. v. Farmers' Ins. Group, 76 Cal. App. 3d 1031, 1050 (1978); citing Offer v. Superior Court, 194 Cal. 114, 118 (1924).

Nor is there any requirement that the insured itself demonstrate damages in order for its insurer to pursue by way of subrogation expenses it incurred on the insured's behalf.  In Interstate Fire and Cas. Ins. Co. v.  Cleveland, supra, like the present matter, subcontractor agreements entered into with the general contractor, Webcor, agreed to indemnify Webcor for any liability arising out of the subcontractors' construction operations.  Frisby, an employee of one of the subcontractors, Delta, was injured when an employee of another subcontractor, Cleveland, was moving debris at the construction site.  Cleveland failed to procure the liability insurance it was obligated to maintain pursuant to its agreement with Webcor and Cleveland rejected Webcor's tender of its defense and indemnification in the resulting lawsuit.  Webcor's general liability carrier, Interstate, subsequently accepted the tender and funded both the defense and

1   settlement of Frisby's lawsuit.  Webcor then instituted a complaint in subrogation against

2   Cleveland for breach of contract.  In response to that action, Cleveland made a number

3   of arguments, including a claim that because Interstate's insured, Webcor, had been

4   fully compensated by Interstate, Webcor had no damages to which Interstate could be

5   subrogated.

6        The Cleveland court rejected that argument on grounds that Webcor's damages

7   for subrogation purposes were measured by whether Webcor would have had a viable

8   claim against Cleveland "had it not been compensated for its loss by Interstate."

9   Interstate Fire and Cas. Ins. Co. v.  Cleveland,, 182 Cal App. 4th at 36.  As the court

10  stated:  "Cleveland's insistence that Webcor suffered no loss because Interstate paid

11  Frisby, and Interstate therefore suffered no loss because it stands in the shoes of its

12  insured, is circular and erroneous."  Id. at 35. n.3.

13       In Northwestern Mutual Ins. Co. v. Farmers' Ins. Exch., supra, the court similarly

14  observed that it "is not a prerequisite to equitable subrogation that the subrogor  [here

15  FOF and FPI] suffered actual loss; it is required only that they would have suffered loss

16  had the subrogee [here PSMIC] not discharged the liability or paid the loss."

17  76 Cal. App. 3d at 1044.

18       The reasoning applied by Cleveland and Northwestern is equally applicable to the

19  present matter:  Plaintiff has stated a viable claim for breach of contract by way of

20  equitable subrogation.  Consequently, LSIC's motion for summary adjudication as to that

21  claim must be denied.

22       LSIC's claim that Plaintiff's claim for breach of the covenant of good faith and fair

23  dealing fails as a matter of law is equally unavailing.  Two of the arguments already

24  posited by Defendant, that the lack of any contract between LSIC and LSMIC precludes

25  breach of contract liability, and that in the absence of damages to FOF and FPI, PSMIC

26  cannot recover for bad faith, have already been rejected, both immediately above and  in

27  the Court's previous Memorandum and Order denying LSIC's Motion to Dismiss.  While

28  ///

1    LSIC's third argument, that the so-called "genuine dispute" doctrine precludes bad faith

2    liability, is new, it is no more persuasive than its predecessors.

3         In addition to the right to sue an insurer for breach of contract, if any insurer acts

4    unreasonably and without proper cause in refusing to provide a defense and in either

5    delaying or failing to pay benefits due under the policy, the insured can sue in tort for

6    breach of the implied covenant of good faith and fair dealing.  Emerald Bay Community

7    Assoc. v. Golden Eagle Ins. Corp., 130 Cal. App. 4th 1078, 1093 (2005), citing Crisci v.

8    Security Ins. Co., 66 Cal. 2d 425, 433 (1967).  Courts have reasoned that because

9    insurance should provide security and peace of mind through protection from calamity, a

10   covenant that the insurer will not frustrate those expectations is imposed on insurers to

11   encourage them to promptly process and pay claims.  This is a special and heightened

12   implied duty to act in good faith that is imposed by law on insurers and made

13   enforceable in tort.  Love v. Fire Ins. Exchange, 221 Cal. App. 3d 1136, 1148 (1990).

14        In moving for summary judgment as to LSMIC's breach of the covenant claim,

15   Defendant again argues that in the absence of an underlying contractual relationship

16   between LSIC and PSMIC, no implied covenant can attach.  Defendants further contend

17   that even if an implied covenant is present, in the absence of any damages to the

18   insureds, FOF and FPI, PSMIC cannot state a viable claim in any event.

19        Both these recycled arguments continue to be misplaced.  First, because

20   Plaintiff's implied covenant claim, like its breach of contract cause of action, is rooted in

21   equitable subrogation, as explained above privity of contract is not necessary since

22   subrogation looks to the nature of insurance as a contract of indemnity as opposed to

23   any relation of contract or privity between insurers.  Northwestern Mutual Ins. Co. v.

24   Farmers' Ins. Group, 76 Cal. App. 3d at 1050; citing Offer v. Superior Court, 194 Cal. at

25   118.  In addition, even if some contractual connection were required, since FOF and FPI

26   were specifically named as additional insureds under policy, they qualify, at the very

27   least, as third party beneficiaries of the policy.  Northwestern Mutual, 76 Cal. App. 3d at

28   1042.  As such, FOF and FPI may enforce promises for their benefit, including the

18

1  insurer's obligation to act in good faith with respect to claims asserted against them.  Id.

2  Moreover, and in any event, as the Northwestern court pointed out, under equitable

3  subrogation, "the duty owed an excess carrier is identical to that owed by the insured."

4  Id. at 1045, citing Peter v. Travelers Ins. Co., 375 F. Supp. 1347, 1350-51 (C.D. Cal.

5  1974).

6        Defendants' second argument, that the insureds suffered no loss to which an

7  insurer like PSMIC can be subrogated, has already been rejected in the preceding

8  section of this Order.  There is no requirement that the insured itself demonstrate its own

9  damages in order for its insured to pursue by way of subrogation expenses it incurred on

10  the insured's behalf.  Cleveland, 182 Cal. App. 4th at 35-36.  This allows an excess

11  insurer like PSMIC to sue the primary insurer in subrogation for bad faith failure to

12  protect the insured's interests.  Northwestern Mutual, 76 Cal. App. 3d at 1040.

13        The cases relied on by Defendant in urging this Court to make a contrary

14  conclusion are distinguishable.  While Defendant cites language in Emerald Bay, supra,

15  to support its argument that an insured must sustain actual damages in order to state a

16  viable claim for breach of the implied covenant (see 130 Cal. App. 4th at 109), the

17  plaintiff in Emerald Bay was the insured itself, not an excess insurer seeking equitable

18  subrogation for damages the insured would have suffered had the excess carrier not

19  stepped in and provided a defense and indemnification.  Additionally, while Gulf Ins. Co.

20  v. TIG Ins. Co., 86 Cal. App. 4th 422 (2001), did deal with a potential equitable

21  subrogation claim, it did so in the context of a surety rather than an excess insurer, and

22  the court noted that the surety's performance bond was not a liability policy and was not

23  even "intended to cover the type of damage" done to the injured party.  Id. at 427.  Gulf

24  noted the dearth of any authority supporting the proposition that a surety "may bring a

25  bad faith action against a general liability carrier."  Id. at 429.  That does not mean,

26  however, that a breach of the covenant claim is not available between a primary and

27  excess carrier as authorized by Cleveland and Northwestern Mutual.

28  ///

1    As a third and final argument, Defendant argues that its rejection of "speculation"

2  that Gala employees played some role in the events leading to Ms. Balfour's injury

3  insulates it from bad faith liability, since at the very least there was a "general dispute" as

4  to LSIC's obligation to extend coverage.  LSIC correctly states that an insurer who

5  denies benefits  "due to the existence of a genuine dispute with its insured as to the

6  existence of coverage liability or the amount of the insured's coverage claim is not liable

7  for bad faith even though it might be liable for breach of contract."  Chateau Chamberay

8  Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 347 (2001); see

9  also Fraley v. Allstate Ins. Co., 81 Cal. App. 4th 1282, 1292 (2000).  Therefore, in

10  appropriate circumstances "a court can conclude as a matter of law that an insurer's

11  denial of a claim is not unreasonable, so long as there existed a genuine issue as to the

12  insurer's liability."  Id.

13    As Plaintiff points out, however, both Chateau Chamberay and Fraley are first

14  party cases, where an insured was making a direct claim to its insurer for damage to its

15  own property, not third party cases like this one, where the insured is seeking defense

16  and indemnity after being sued by a third party.  "There are material differences in the

17  purposes of first party insurance policies (that obligate the insurer  to pay damages

18  claimed by the insured itself) and third party insurance policies (that obligate the insurer

19  to defend, settle and pay damages claimed by a third party against the insured)."

20  Howard v. American Nat'l Fire Ins. Co., 187 Cal. App. 4th 498, 530 (2010).  Courts have

21  consequently found against applying the "genuine dispute" doctrine in a third party duty

22  case like the instant matter.  See, e.g., Mt. Hawley Ins. Co. v. Lopez, 215 Cal. App. 4th

23  1385, 1424 (2013).  This is because a third party insurer "must defend a suit which

24  potentially seeks damages within the coverage of the policy."  Gray v. Zurich Ins. Co.,

25  65 Cal. 2d 263, 275 (1966) (emphasis in original).  "'[I]t has never been held that an

26  insurer in a third party case may rely on a genuine dispute over coverage to refuse

27  settlement.  Howard, 187 Cal. App. 4th at 530.

28  ///

1         To the extent FOF and FPI qualified as additional insureds under the LSIC policy,

2   a duty to defend arose, irrespective of any ultimate finding of liability.  "To conclude

3   otherwise . . . would create a peculiar form of coverage restricted to only those cases

4   which the insurer decides are brought on meritorious legal and factual programs.  To

5   permit the insurer to determine its duty to defend in this manner would hardly give the

6   insured the peace of mind and security which the insured has every reason to expect."

7   California Ins. Guar. Ass'n v. Wood, 217 Cal. App. 3d 944, 948 (1990).  Consequently,

8   summary judgment premised on LSIC's "genuine dispute" cannot be had.   Moreover,

9   and in any event, "the reasonableness of an insurer's conduct is ordinarily a question of

10  fact, except in the exceptional instance when 'only one reasonable inference can be

11  drawn from the evidence." Mt. Hawley Ins. Co. v. Lopez, 215 Cal. App. 4th at 1424

12  (internal citations omitted).  Summary judgment is therefore inappropriate for that reason

13  as well.

14

15                      **CONCLUSION**

16

17        For all the reasons set forth above, Defendant LSIC's Motion for Summary

18  Judgment, or alternatively for partial summary judgment as to certain issues, is DENIED

19  in its entirety.

20        IT IS SO ORDERED.

21  Dated:  August 24, 2016

22

23                                MORRISON C. ENGLAND, JR.

24                                UNITED STATES DISTRICT JUDGE

25

26

27

28